## ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA v. KNORR et al.

### No. 2051.

Circuit Court of Appeals, Tenth Circuit.

June 6, 1940.

E. W. Dillon, of Columbus, Ohio, and Benj. F. Hegler, of Wichita, Kan. (W. R. Glass and M. P. Shearer, both of Wichita, Kan., on the brief), for appellant.

Howard T. Fleeson and Wayne Coulson, both of Wichita, Kan. (C. H. Brooks and Carl G. Tebbe, both of Wichita, Kan., on the brief), for appellees.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

The Order of United Commercial Travelers of America is a fraternal insurance corporation, organized and existing under the laws of Ohio. On January 2, 1917, it issued a Class A accident certificate of insurance to George W. Knorr, Jr., insuring him against certain specified losses resulting from bodily injuries effected solely through accidental means. Item 11 of the policy provided for the payment of $6,300 for accidental death.

The policy contained the following provisions: "If any Class A insured Member shall lose one or both hands or one or both feet or one or both eyes, he shall report this fact to the Supreme Secretary of the Order in writing within thirty (30) days and the Supreme Executive Committee shall cancel his Class A Certificate. If any Class A insured Member shall lose a hand, an arm, a foot or leg or the sight of either eye, and shall, thereafter, before due notice is given thereof, receive an accident covered by this Article, he or his beneficiary, shall be entitled to but one-half of the maximum benefits provided in this Section for the injuries sustained. If such loss shall be confined to one hand or one foot or one eye, and the Supreme Executive Committee deems it advisable and the member desires the same, a Certificate of Insurance under Class B may be issued to him. The loss of both hands, both feet or both eyes shall at once cancel the Certificate of Insurance of any Insured Member."

Article XV, Section 18, of the constitution of defendant, which is a part of the policy, provides: "Nor shall the Order be liable for any death benefit when the member dies as the result of injuries sustained as a result of a gun shot wound or the alleged accidental discharge of firearms where there is no eye-witness except the member himself, in an amount greater than Five Hundred Dollars ($500)."

Knorr had had considerable difficulty with his left eye, the trouble having extended over a number of years. This condition was brought about by blood clots forming in the eye, which affected the vision. At times the vision of his left eye was so impaired that he had only light perception and light projection in that eye. By light perception is meant light consciousness but not the ability to distinguish objects. By light projection is meant the ability to determine only the direction from which

light proceeds. Knorr consulted a doctor for the first time on February 10, 1936. Between then and November 12, 1938, he took treatments for this condition of his eye on numerous occasions. The doctor testified that where one had only light perception and light projection, the eye would have practically no value as a visual organ; that for practical use, such an eye "is no good"; that the only value it would have would be a psychological value. The doctor further testified that, in addition to other occasions, he saw Knorr on June 29, 1937, July 22, 1937, March 3, 1938, October 22, 1938, and November 12, 1938; that on all of these occasions he had only light perception and light projection in his left eye; that he could not say that during the intervals between these times the vision of Knorr's eye had not come back; that Knorr gave him no history of any of the hemorrhages having cleared up during that period of time, but did not say positively that they had not; that if it were true that the condition of the eye continued as it was when he saw it, in June, 1937, until November 12, 1938, a period of over a year, this fact would eliminate considerably the possibility of the condition being relieved.

On Sunday, December 18, 1938, Knorr left his apartment in Wichita, Kansas, stating that he was going hunting. He took his shotgun, and went hunting in his automobile. On the same morning one Francis Drury also went hunting in his car. Drury was driving west along the highway about a mile north of Wichita, Kansas, when he first saw Knorr in his car, approaching from the south. Knorr entered the intersection of the highway on which Drury was traveling, stopped and then turned left and proceeded west on the highway about one-half mile ahead of Drury. Drury had been driving faster than Knorr and was overtaking him. When Drury had approached within about one hundred yards of Knorr's car, he saw Knorr's car stopped, the door open, and Knorr's body falling to the ground. He had not seen or heard a shot fired; he had the window of his car closed and the radio playing; he had looked away for an instant and when he looked back he saw Knorr's body falling to the ground. · He drove by, and seeing Knorr lying on the ground with blood under him, continued to the first house where he called the sheriff.

The Deputy Sheriff who answered the call testified that when he arrived, the motor of the car was still running and Knorr was lying in the road on his back. The car was facing west and Knorr was on the south side of the car and to the back of it. The shotgun was lying on the floor of the car in the front seat. There was a box of shells in the seat to the right of the driver's seat. Some shells were out on the seat and some empty shells lay on the floor of the car. There was no damage evidenced by bullets or pellets going through any of the glass or the top of the car, nor was there blood anywhere on the car. Knorr had been shot through the body just above his heart.

The beneficiaries under the insurance policy filed a claim of $6,300 with the company for benefits payable under the policy. The claim was denied and suit was instituted to recover. It is admitted that the maximum amount that may be recovered is $5,000. The parties will be referred to as they appeared in the court below.

The defense was: First, that deceased committed suicide; second, that if death was accidental, the liability of defendant was limited to $500 because there was no eye-witness to the death resulting from the accidental discharge of firearms; and, third, that if plaintiffs were entitled to recover, in any event recovery was limited to $2,500, because deceased had lost an eye and had not notified the company as required by the policy. Issues were joined and a trial was had to a jury. A verdict was returned for plaintiffs for $5,000, upon which judgment was entered. A motion for a new trial was overruled and an appeal has been taken to this court.

It is charged that the court committed error in refusing to give various instructions requested by the defendant and in giving certain instructions which were given.

Complaint is made of the following instruction given by the court:

"You are instructed that the constitution of the defendant provides that it shall not be liable in excess of $500.00 for the death of a member by gunshot wound or the accidental discharge of firearms where there was no eye witness except the member himself. Now, this provision should be given a liberal interpretation. To comply with this clause, there need not be proof that the human eye of another person actually saw the shot fired or as has been expressed, that the human eye is not required to follow the bullet in its course, or that the

pulling of the trigger or the action of the trigger need not have been observed. It is sufficient if the jury conclude from all of the facts and circumstances that the accident did not occur when the party was alone, or in complete solitude, as is the case with a person who takes his own life. It is sufficient if the jury conclude from all the facts and circumstances that the accident did not occur in the solitude sought by suicides, but that it did occur as is often the case in accidents when a third person was in a position to observe the general circumstances surrounding the untoward event."

Plaintiffs concede that the questioned instruction substantially follows the decision of this court in Wertheimer v. Travelers' Protective Ass'n, 10 Cir., 64 F.2d 435, but contend that the Wertheimer case does not correctly state the law. We have reexamined the Wertheimer case and adhere to the principles announced therein. The challenged instruction correctly states the law as it has been declared by this court and the objection thereto is not well founded.

■ The court also instructed the jury that by the loss of an eye is meant the complete loss of the eye and that if the jury found that the condition of the deceased's eye was such as to be of some benefit to him in light perception, the provision of the certificate reducing the amount of coverage would not apply.

What is meant by the loss of an eye has received the attention of many courts, and it has been held without exception that by the loss of an eye is meant the loss of the use of the eye for any practical purpose. In Pan-American Life Insurance Co. v. Terrell, 5 Cir., 29 F.2d 460, 461, the rule is stated as follows: "It is quite uniformly held that the entire sight is lost, although it is not completely destroyed, if what sight is left is of no practical use or benefit."

Couch Cycl. of Insurance Law, Vol. 7, § 1685, page 5807, states the rule as follows: "On the other hand, the sight of an eye will be deemed lost within the meaning of a provision for 'loss of entire sight of one eye if irrevocably lost', where 'all useful and practical sight' is lost; and this although light can be distinguished from darkness and objects can be perceived temporarily at brief intervals. There also is a loss of the 'entire sight of one eye,' where the eye, due to an injury, becomes absolutely and permanently useless, although there is a light perception, which, however, cannot be used in any kind of employment. Similarly, the 'entire sight of an eye' is irrevocably lost where, although a mere sensibility of light and shadow remains, its usefulness is lost and there is no reasonable hope of restoration."

To the same effect, see Locomotive Engineers' Mut. Life & Accident Ins. Co. v. Meeks, 157 Miss. 97, 127 So. 699; Life & Casualty Co. of Tennessee v. Peacock, 220 Ala. 104, 124 So. 229; Travelers' Protective Ass'n of America v. Ward, 99 Ind.App. 97, 187 N.E. 55; Continental Casualty Co. v. Linn, 226 Ky. 328, 10 S.W.2d 1079; Bosworth v. Metropolitan Life Ins. Co., 114 W. Va. 663, 173 S.E. 780; Maynard v. Locomotive Engineers' Mutual Life & Accident Ins. Ass'n, 16 Utah 145, 51 P. 259, 67 Am. St.Rep. 602.

One has lost an eye when the eye is no longer of some practical value or benefit. It is not required that the last vestige of light be extinguished before it can be said that one has lost an eye.

Plaintiffs urge in further support of the instruction that the meaning of a term or word in a policy is most strictly construed against the company. This principle of law comes into operation only where there is ambiguity as to the meaning of a term, and there can be no ambiguity when a term has been judicially defined.

■ The court further instructed the jury that: "If you find that George W. Knorr, Jr., had lost the sight of an eye as I have stated, but if you further find from all of the evidence in the case that—if you do not further find from all of the evidence in the case that there was a causal connection between the manner in which he met his death and the condition of his left eye, that is, if he could not see out of that eye, but that had nothing to do with the manner in which he met his death, then I instruct you that whether George Knorr had lost the sight of his eye is immaterial in determining the amount which the plaintiffs should recover in this case."

Whether the loss of the eye contributed to the accident resulting in death was not the question under consideration. The matter to be determined was the coverage of the policy. The effect of this certificate, fairly construed, is that where a member has both eyes the company will issue an "A" certificate of insurance, agreeing to pay his beneficiary $5,000 if death results

from accidental causes, but that if he has but one eye the maximum of indemnity he may have is $2,500; that where a member has an "A" certificate and thereafter loses an eye he must notify the company, whereupon his "A" certificate will be canceled and he may then have a "B" certificate. If he does not notify the company of such loss, the certificate remains in force for only $2,500, the same as though it had been canceled and a "B" certificate had been issued.

If the insured suffered the permanent loss of the sight of an eye and thereafter lost his life through accidental means, recovery under the terms of the policy was limited to $2,500.

The challenged instruction did not properly present this issue to the jury for its determination.

The decision of the trial court is reversed and the case is remanded.